Jeffrey L. **OKERLUND** and Lorrie Schwan–Okerlund; David J. Schwan and Diane C. Schwan; Mark D. Schwan; and Paul M. Schwan and Christine H.M. Weigel–Schwan, Plaintiffs,

v.

The **UNITED STATES**, Defendant.

Lorrie Schwan–Okerlund and Jeffrey L. Okerlund, Plaintiffs,

v.

The United States, Defendant.

Nos. 99–133T, 99–134T.

United States Court of Federal Claims.

Aug. 23, 2002.

1. A company brochure describes the birth of the retail route home delivery system with this anecdote: "In 1952, ... Marvin Schwan discovered that ice cream was selling at a higher price north

Allen Irving Saeks, Minneapolis, MN, for plaintiffs.

G. Robson Stewart, Washington, D.C., for defendant.

## OPINION

WILSON, Judge.

This gift and income tax refund case came before the court for trial of two related issues: the fair market value of a minority nonvoting interest in Schwan's Sale Enterprises, Inc. ("SSE") as of December 31, 1992 and as of December 31, 1994. Upon consideration of the expert testimony and other evidence presented at trial, the Court holds that the fair market value of the SSE stock at issue on December 31, 1992 was $24.36 per share, and on December 31, 1994, was $19.77 per share.

## BACKGROUND

Unless otherwise noted, the following facts are contained in the parties' Joint Stipulation of Facts. Schwan's Sales Enterprises, Inc. (SSE) was founded in 1948 as a milk processing operation in Marshall, Minnesota. From 1948 to 1952, SSE expanded its enterprise from a milk bottling facility to a café and ice cream manufacturer. In 1952, Marvin Schwan created and marketed high quality "Schwan's" ice cream directly to farm families in the Marshall, Minnesota area.[1] This new strategy marked the beginning of the "Retail Route Home Delivery System," which provides rural and metropolitan families with a varied selection of frozen foods. The route

of Marshall. Identifying an opportunity to sell at a profit, he loaded a truck with ice cream, drove north, and sold the entire supply by sundown." (Def.'s Ex. 1003, at 2.)

system formed the basis of SSE's growth and expansion during the decades that followed.

In 1965, SSE introduced a "Wholesale Route System," which supplies retail food stores, restaurants and recreational establishments with a variety of prepackaged food products under numerous brand names, including Tony's Pizza, Red Barron Pizza, Better Baked Foods, and Tino's. Currently, SSE is a wholesaler and retailer of a variety of food products, approximately two-thirds of which are produced by the company and the remaining third purchased by the company and re-sold. (Def.'s Ex. 1003, at 11.) SSE's operations include international, as well as domestic sales, which totaled approximately $1.95 billion in 1992 (J.Ex. 508, at 38.) and $2.3 billion in 1994 (J.Ex. 77, at 2045.). SSE's workforce is comprised of approximately 16,500 employees. As of 1992, SSE's top management team consisted of President Marvin Schwan, a Tax Accountant, Director of Marketing, General Counsel, Controller, National Sales Manager, and Manufacturing Manager. (J.Ex. 508, at 24.)

SSE is a privately held company, capitalized with two classes of stock, voting and nonvoting. The stock is not listed on any stock exchange and is not publicly traded. Under the terms of its by-laws, the company has the right-of-first refusal on all sales or transfers of common stocks held by certain stockholders, based on a fair market value transfer price.

In December 1992, SSE nonvoting stock had a 100 to 1 split, increasing the number of nonvoting shares from 385,550 to 38,550,000. In addition, Marvin Schwan, SSE's CEO, purchased 3,755 newly-issued voting shares. As of the December 31, 1992 valuation date, a total of 50,000 shares of voting common stock, and 500,000,000 shares of nonvoting stock were authorized, and 7,610 shares of voting and 38,555,000 nonvoting shares were issued and outstanding. (J.Ex. 508, at 25.) SSE's capital structure was "skewed;" voting stock consisted of 0.02 percent of SSE's equity capital, while the remaining 99.98 percent

was comprised of nonvoting shares. (Def.'s Ex. 1003, at 13.)

On May 9, 1993, Marvin Schwan, the company's founder and top executive officer, died unexpectedly at the age of sixty-four. Prior to his death and to the December 1992 valuation date, Marvin Schwan contributed 2,485 of his recently-purchased voting shares to the pre-existing Marvin M. Schwan Revocable Trust. He also gifted 1,270 of these voting shares to a newly-created Great, Great Grandchildren's Trust ("3G Trust"). At the time of Marvin Schwan's death, 5,076 voting shares and 25,910,100 non-voting shares were held in the Marvin M. Schwan Revocable Trust. In accordance with Marvin Schwan's estate plan, a charitable foundation known as the King's Foundation received the shares owned by this revocable trust, which comprised two-thirds of outstanding SSE stock. The Foundation then sold these shares back to SSE pursuant to a February 4, 1993 Amended Redemption Agreement.

## 1992 Gift Tax

Marvin Schwan's four children and three of their spouses, Lorrie Schwan–Okerlund (Lorrie) and her husband Jeffrey Okerlund (Jeffrey), David J. Schwan (David) and his wife Diane (Diane), Paul M. Schwan (Paul) and his wife Christine H.M. Weigel–Schwan (Christine), and Mark D. Schwan (Mark) established separate trusts on December 31, 1992 for the primary benefit of their respective children. Plaintiffs Lorrie, David and Paul each transferred as gifts 50,000 shares of nonvoting stock to their respective trusts, splitting their gifts with their spouses pursuant to § 2513.[2] Mark, electing not to split his gift, transferred only 25,000 shares of SSE which were previously distributed to the Schwan children by Marvin Schwan's previously established trusts. Plaintiffs obtained a valuation of the SSE stock from Business Valuation Consultants (Gray) in June 1993. Based on Gray's per share value of $24.03, each plaintiff filed a gift tax return which reported a gift of $600,750, a unified credit of $192,800, a Generation–Skipping Tax (GST) exemption of $600,750, and a tax of $277.

**2.** All sections refer to the Internal Revenue Code of 1986, as amended, codified at 26 U.S.C., unless otherwise noted.

In 1996, Willamette Management Associates (Willamette) provided plaintiffs with a lower value for SSE minority shares in connection with federal district court litigation involving a dispute between the Schwan children and SSE over the redemption of stock after Marvin Schwan's death in 1993. The matter was ultimately settled, and the nonvoting stock sold back to SSE at a value of $26.00 per share in 1997. The Willamette appraisal reported a value of $17.40 per share for the valuation date of December 31, 1992. As a result of this reduced appraisal from $24.03 to $17.40 per share, in July 1996, the plaintiffs filed for a Claim for Refund and Request for Abatement with the IRS, seeking restoration of their respective unified credits in the amount of $59,100, a restoration of their respective GST exemptions in the amount of $165,760 each, and a gift tax refund of $277.

## 1994 Gift Tax

In January 1994, Lorrie, Mark, David and Paul each transferred $650,000 in cash to the Marvin M. Schwan 1992 Grandchildren's Irrevocable Trust. Accordingly, in April 1995, each plaintiff filed with the IRS a gift tax return reporting the $650,000 cash transfers. Lorrie, David and Paul consented to split their gifts with their spouses pursuant to § 2513. As a result, Lorrie, Jeffrey, David, Diane, Paul and Christine each reported GST exemptions in the amount of $325,000 for their 1994 gifts and $600,750 for their prior 1992 gifts. Each of their taxable gifts for 1994 and prior periods totaled $925,750.

In December 1994, Lorrie also transferred 1,000 shares of nonvoting SSE stock to two separate trusts established for her children. Lorrie and Jeffrey reported the value of the 2,000 shares of nonvoting capital stock as $12.51 per share and a tax liability of $123,765. In October 1995, Lorrie and Jeffrey each submitted another gift tax return which added the $12,510 gift, representing the 1,000 share transfer in 1994, for a total taxable gift of $938,260.

In July 1996, plaintiffs filed claims for refund with respect to their 1994 gift tax returns, based on the adjustments reported in their 1992 claims for refund. Specifically, the 1994 refund claims stated that the 1992 transfers of SSE nonvoting stock were overvalued by $165,750 per transfer, based on the 1992 Willamette appraisal of $17.40 per share, resulting in a reduction from $925,750 to $760,000 in the total individual taxable gifts for 1992. The 1994 claims for refund reflected a revised gift tax liability of $59,400. Accordingly, each plaintiff's claim sought a gift tax refund of $64,365.

## 1994 Income Tax

In December 1994, Lorrie donated 27,000 shares of SSE nonvoting stock to Salt of the Earth Foundation, a § 501(c)(3) nonprofit organization. Lorrie and Jeffrey's 1994 income tax return, filed in November 1995, included a copy of an appraisal by Business Valuation Consultants (1995 Gray Report), reflecting a value of $20.85 per share of donated SSE minority stock as of December 31, 1994. At the time they filed their 1994 income tax returns, Lorrie and Jeffrey formally repudiated and rejected the value as an overstatement. Instead, Lorrie and Jeffrey reported a $337,770 (i.e., $12.51 per share) itemized charitable gift to the Salt of the Earth Foundation. Subsequently, in September 1998, Lorrie and Jeffrey filed an amended 1994 joint income tax return, increasing their charitable deduction from $337,770 to $533,912, based on a July 28, 1998 Willamette appraisal which valued the nonvoting stock at $19.77 per share as of December 31, 1994. The amended return reported a decreased tax liability of $77,672 and requested a refund of that amount.

On October 8, 1998, the IRS processed the amended income tax return and marked the return as "Accepted as Filed by Classification." Accordingly, on November 9, 1998, the IRS posted an abatement of $77,672 plus a credit of $19,977.21 in interest, and notified Lorrie and Jeffrey that the refund was being processed. The IRS subsequently cancelled the refund. Plaintiffs Lorrie and Jeffrey allege that they were not aware of the abatement and cancelled refund until they conducted pre-trial discovery in this case.

In 1999, subsequent to the filing of this action, the IRS, based on an appraisal prepared by Financial Research, Inc. (FRI), assessed deficiencies against each plaintiff.

FRI valued SSE's nonvoting stock at $29.57 per share as of December 31, 1992. As a result, the IRS assessed a gift tax deficiency of $51,246 for 1992 and $4,055 for 1994 against each plaintiff. In addition, the IRS assessed each plaintiff an additional $37,335.62 in interest for 1992 and $1,955.64 in interest for 1994.

## ANALYSIS

The task of determining the fair market value of SSE's minority stock requires consideration of well-established statutory and regulatory criteria. Treasury Regulation § 25.2112–1 defines the fair market value of transferred property as the price at which the property would change hands by a hypothetical willing buyer and willing seller, neither being under duress to buy or to sell, as well as both having reasonable knowledge of the relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). The hypothetical willing buyer and hypothetical willing seller are presumed to be seeking to maximize their profit from the transaction. *Estate of Davis v. Comm'r*, 110 T.C. 530, 535, 1998 WL 345523 (1998) (citing *Estate of Curry v. United States*, 706 F.2d 1424, 1428 (7th Cir.1983)). A gift of property is valued as of the date of transfer. 26 U.S.C. § 2512(a). The value of the gift is determined by the value of the property passing from the donor, not the property received by the donee. Treas.Reg. § 25.2511–2(a).

Where there is no public market for the property to be valued and no arm's length transaction on which to base a valuation, as with the closely-held stock at issue in this case, the fair market value of the stock is determined by taking the company's net worth, earning potential, capacity to pay dividends and other relevant factors into consideration. *Estate of Klauss v. Comm'r*, 79 T.C.M.(CCH) 2177, 2000 WL 823377 (2000); Treas.Reg. § 25.2512–2(f). Revenue Ruling 59–60, which is "widely accepted as setting forth the appropriate criteria to consider in determining fair market value," *Estate of Newhouse v. Comm'r*, 94 T.C. 193, 217, 1990 WL 17251 (1990), identifies eight of these relevant factors: (a) the nature of the business and the history of the enterprise from its inception; (b) the economic outlook in general and the condition and outlook of the specific industry in particular; (c) the book value of the stock and the financial condition of the business; (d) the earning capacity of the company; (e) the dividend-paying capacity; (f) whether or not the enterprise has goodwill or other intangible value; (g) sales of the stock and the size of the block of stock to be valued; and (h) the market price of freely traded stocks of corporations engaged in the same or a similar line of business. In addition, when valuing minority interest stock of a closely-held corporation, the application of certain discounts may be warranted to reflect the stock's lack of marketability and/or lack of voting rights. *Central Trust Co. v. United States*, 158 Ct.Cl. 504, 524, 305 F.2d 393 (1962) (consideration of a discount when a stock lacks marketability is a recognized appraisal technique for use in arriving at a fair market value for unregistered stock); *see also Estate of Marmaduke v. Comm'r*, 78 T.C.M. (CCH) 590, 1999 WL 818788 (1999).

In valuation cases, the Court relies heavily on expert testimony about the fair market value of closely-held stock. *Central Trust Co. v. United States*, 158 Ct.Cl. 504, 514, 305 F.2d 393 (1962). However, the Court is not bound by an expert's opinion. *Wall v. Comm'r*, 81 T.C.M. (CCH) 1425, 2001 WL 335845 (2001). The Court weighs the credibility of an expert's testimony in light of his or her qualifications and the evidence before the Court. The Court may either accept the expert opinion in its entirety, accept portions of the expert's opinion, or reject the opinion altogether and reach a determination on its own after examining the evidence in the record. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); *Lukens v. Comm'r*, 945 F.2d 92, 96 (5th Cir.1991), *aff'g* 58 T.C.M. (CCH) 1470, 1990 WL 16353 (1990).

Valuations, moreover, represent approximations. "The valuation process is an 'inexact science' requiring reasonable practical, and rational approximation based upon all information before the court." *Kraft, Inc. v. United States*, 30 Fed.Cl. 739, 765 (1994)

(internal citations omitted); *See also Anderson v. CIR,* 250 F.2d 242, 249 (5th Cir.1957), *cert. denied,* 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958) (determination of value need not be based on specific expert testimony, provided the determined value is within the range of figures that may be deduced from the evidence).

### Expert Qualifications

Plaintiffs challenged at trial both the qualifications of Dr. Spiro as an expert on valuation, and the admissibility of defendant's expert report, labeled the American Valuation Group Report ("AVG Report"). Fed.R.Evid. 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

■ The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), characterized the Court's function as that of a "gatekeeper" in determining whether an expert's testimony constitutes "scientific knowledge" that will assist the trier of fact to understand or determine a fact in issue. A judge performs this function by ensuring that an expert's testimony is relevant and reliable. *Id.* at 597, 113 S.Ct. 2786. The Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), extended the principles of *Daubert* applicable to scientific experts to all experts possessing "technical" or "other specialized" knowledge. In determining the admissibility of nonscientific expert testimony, the Court may consider the following *Daubert* factors:

(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys a general acceptance within the scientific community.

*Kumho Tire* at 149–50, 119 S.Ct. 1167, (citing *Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786).

In assessing an expert witness's reliability, the court must determine whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. The use of data and methodology similar to those used by other experts is suggestive of reliability and relevance. *Id.*

Defendant's voir dire examination revealed that Dr. Spiro holds a doctorate in business economics and finance from the University of California at Los Angeles. For over ten years, he served as a tenured professor at California State University, where he taught courses in finance and business policy. Since 1985, Dr. Spiro has managed American Valuation Group, a consulting firm specializing in economic analyses and financial valuations. (Def.'s Ex. 1003, at 114.) In that capacity he directs 95 percent of all valuation assignments. (August 14–15, 2001 Trial Transcript (Tr.) at 219.) Dr. Spiro has testified as an expert approximately fifty times in various state and federal courts. In addition, in 2001, the California Superior Court appointed Dr. Spiro to serve as an arbitrator in a business valuation case with authority to issue a binding arbitration decision. (Tr. at 217–262.)

■ In addition to challenging Dr. Spiro's qualifications, plaintiffs challenged Dr. Spiro's personal knowledge of the AVG appraisal of SSE stock and the admissibility of the report based on the small number of hours billed by Dr. Spiro relative to his assistants. It is well-settled that an expert may render an opinion on hypothetical questions and may testify not only from facts or data perceived by him but also from what is made known during or before a hearing. *Teen–Ed, Inc. v. Kimball Intern., Inc.,* 620 F.2d 399 (3rd Cir. 1980). In other words, an expert's testimony need not be based on personal knowledge. *Libas, Ltd. v. United States,* 193 F.3d 1361 (Fed.Cir.1999); *See also Estate Of Carey by Carey v. Hy–Temp Mfg., Inc.,* 929 F.2d 1229, *reh'g denied* (7th Cir.1991). In any event, on direct examination, Dr. Spiro testified that he supervised "all of the [firm's] work," directed the staff in conducting valuation research,

and was familiar with the conclusion and methodologies of the AVG report. (Tr. at 262.) The Court found that both experts were sufficiently involved in the production of their respective reports and knowledgeable about its methods and conclusions to provide relevant and reliable testimony.[3]

Although the experts disagreed on the specific pricing multiples and discounts taken for lack of marketability, they did not differ on the use of generally accepted methodologies for appraising the value of closely-held stock. Indeed, the income and market approaches utilized by both experts have been considered reliable methods for business analysis for many years. *Gross v. Comm'r*, 78 T.C.M. (CCH) 201, 1999 WL 549463 (1999). Because these valuation methods have enjoyed general acceptance within the valuation community, these approaches satisfy the *Daubert* and *Kumho Tire* standard for admissible expert testimony. Based on Dr. Spiro's academic and professional credentials, and in accordance with the criteria for expert testimony set forth in *Daubert* and *Kumho Tire*, the Court admitted the AVG report into evidence and certified Dr. Spiro as an expert for the purpose of testifying about the value of SSE stock.

**3.** The government did not challenge Dr. Pratt's expert qualifications at trial. Dr. Pratt founded Willamette Management Associates in 1969. He holds a doctorate in business administration with a major in finance, is a fellow of the American Society of Appraisers and a master, certified business appraiser. (Tr. at 22–24.) Dr. Pratt has taught classes for the American Society of Appraisers, as well as for the American Institute of Certified Public Accountants. He has published eight books and over 100 articles, including a well-known treatise on business valuation. In addition, Dr. Pratt testified that he has conducted approximately 3,500 appraisals in twenty-two years. (Tr. at 35.)

**4.** Plaintiffs' and defendant's experts chose not to utilize a third broad approach known as the Asset-based Approach. Under the asset-based approach, the value of a business is equal to the cost that would be incurred in acquiring a group of assets of similar utility. (Def.'s Ex. 1003, at 26.) Dr. Spiro did not find this method useful for the valuation of stock because it fails to capture any intangible value resulting from having assets assembled in the manner that they are in SSE. Dr. Pratt did not utilize this method because the subject minority interest did not

## Valuation Methodology

Both experts utilized the Market Approach and the Income Approach to determine the value of SSE stock.[4] Plaintiffs' expert also utilized the Transaction Method, another method incorporated in the Market Approach.[5] For the reasons discussed below, the Court found the indications of value derived by the government's expert using the market and income approaches more credible than the values derived by plaintiff's expert.

### Market Approach

The market approach is based on the assumption that the most an investor will spend for an asset is the price other investors are paying for the same or a similar asset. Central to the capital market method is a comparison of the subject company to similar companies which are publicly traded, referred to as "guideline companies."[6] Consistent with the methodology, both experts derived market pricing multiples[7] from guideline companies' financial fundamentals and quoted trading prices, and then applied these market pricing multiples to SSE's financial fundamentals in order to arrive at indications of value.

Both experts relied upon essentially the same guideline companies in arriving at their

have the ability to liquidate SSE's underlying assets and thus the experts did not have access to the value of such assets. (J.Ex. 508, at 60.)

**5.** The transaction method bases pricing multiples on transaction prices instead of trading prices. Therefore, an adjustment for a minority interest, or lack of control, must be made. "A minority interest discount reflects the minority shareholder's inability to compel either the payment of dividends or liquidation in order realize a pro rata share of a corporation's net earnings or net asset value." *Estate of Branson v. Comm'r*, 78 T.C.M. (CCH) 78, 1999 WL 492477 (1999). Both expert witnesses testified that the transaction method serves as a "check" on the capital market method, but is not by itself critical to the analysis. (Tr. at 102, 337.)

**6.** Both experts testified that publicly traded guideline companies are never identical to the subject company. (Tr. at 39, 237.)

**7.** "Market multiples" are multiples of some type of capital as priced in the public market or as priced in a private transaction relative to some underlying company fundamental, such as book value, earnings or cash flow. (Tr. at 60.)

respective market pricing multiples.[8] Both experts agreed that as of December 31, 1992, SSE was more profitable than the average guideline company. They also agreed that compared to the average guideline company, SSE's financial leverage was lower, it was more liquid, and it had experienced more growth, primarily through acquisitions. (Tr. at 167–68, 240, 283.)

Dr. Spiro, the government's expert, noted that SSE's lower level of financial leverage and its higher liquidity ratio[9] indicated a lower level of risk than the guideline companies. Recognizing that SSE lacked a nationally recognized brand name, in calculating the Market Value of Invested Capital (MVIC)/Sales multiple, Dr. Spiro chose a multiple close to the mean because SSE was more profitable and experienced higher growth rates than the guideline companies. (Tr. at 327.) The remaining multiples were selected near either the mean or median because of higher earnings, but also took into account that SSE was, on average, smaller in size and lacked a national brand name. Dr. Spiro gave the greatest weight to the MVIC/EBIT and MVIC/EBITDA in arriving at an average multiple because, he purported, they most closely measure cash flow.[10] (Tr. at 328–30.)

Dr. Pratt did not give great weight to the Price/Earnings and Price/Cash Flow multiples because, he purported, debt-free indicators are more reliable than the equity-based market pricing multiples due to their adjustment for the difference in capital structure between SSE and the guideline companies. (Tr. at 80–82.) Unlike Dr. Spiro, Dr. Pratt calculated the market pricing multiples based on two historical periods, the last twelve month period and an average of the last five fiscal years. In calculating the MVIC/EBIT and MVIC/EBDIT multiples, Dr. Pratt noted that SSE's EBIT and EBDIT growth were above average in comparison to the guideline companies during the last twelve month period. (Tr. at 61.) Dr. Pratt also noted that SSE's capital structure consisted of less debt than the guideline companies and that SSE's net sales were above the guideline companies' average. (Tr. at 167.) Moreover, Dr. Pratt's comparison of SSE with the guideline companies revealed that SSE's earnings and cash flow growth were both above average.

After calculating market pricing multiples based upon guideline company quoted trading prices and financial data, both experts adjusted for risk factors that affect the company as a whole.[11] The primary difference between the two experts' pricing multiples for valuing SSE common stock is that Dr. Pratt took a far more pessimistic view of the

---

8. Both experts included in their group of guideline companies Campbell Soup Company, Curtice–Burns Foods, Inc., Dean Foods Company, Dreyer's Grand Ice Cream, Inc., International Multifoods Corporation, Pet Inc., and Rykoff–Sexton, Inc.

9. The liquidity ratio (current assets divided by current liabilities) is one indicator of a firm's ability to meet its short-term obligations.

10. Defendant's expert witness, Dr. Spiro, selected the following pricing multiples: (Def.'s Ex. 1003, at 39.)

| Pricing Multiple | Selected Multiple | Comparison to Guideline Companies |
|---|---|---|
| Market Value of Invested Capital–to–Sales (MVIC/ Sales) | 0.90 | 0.98 (mean) |
| MVIC–to–Earnings Before Interest and Taxes (MVIC/ EBIT) | 11.00 | 11.92 (mean) |
| MVIC–to–Earnings Before Interest, Taxes, Depreciation and Amortization (MVIC/ EBITDA) | 8.0 | 8.46 (median) |
| Price–to–Earnings Before Taxes (P/ EBT) | 11.0 | 11.21 (median) |
| Price–to–Book Value of Equity (P/ Book) | 3.5 | 3.28 (median) |

11. Risk factors that affect the value of the company as a whole are referred to as "enterprise risks." Risk factors that specifically affect whether an average buyer would invest in the

company as a result of certain risk factors.[12] The 1992 Willamette Report, submitted by plaintiffs, identified the following risks to the company: (1) reliance on a home delivery "route system;" (2) thin management ranks; (3) reliance on a key management figure, Marvin Schwan; (4) the risk of food contamination; (5) the competitors' greater human resources; (6) SSE's inability to invest in a national advertising campaign, based on its lack of a nationally recognizable brand name and the demographics of its customer base; (7) less diversity in product offerings than the guideline companies; and (8) the relatively small size of SSE's Board of Directors. Based on these perceived risk factors, Dr. Pratt selected pricing multiples for SSE that were generally near the bottom, if not below the range [13] for the guideline company multiples, despite his determination that SSE had much more positive financial fundamentals than the guideline companies and were above the average for every pricing multiple.[14] (J.Ex. 508, at 26; Tr. at 49–51.)

company and at what price are referred to as "shareholder risks," and affect the calculation of the discount for lack of marketability. (Tr. at 83–84.)

**12.** The following comparison between Dr. Spiro's and Dr. Pratt's pricing multiples, derived from the two expert reports, reveals a greater deviation from the guideline company median by Dr. Pratt:

| Pricing Multiples | Defendant's Expert: Difference between median and selected multiple | Plaintiffs' Expert: Difference between median and selected multiple |
|---|---|---|
| MVIC/Sales | + 5% | − 20% |
| MVIC/EBIT | − 12% | − 44% |
| MVIC/EBDIT | − 10% | − 36% |
| MVIC/TBVIC | N/A | − 5% |
| P/Book Value | + 7% | N/A |
| P/EBT | − 2% | N/A |
| P/E | N/A | − 27% |
| P/Cash Flow | | − 13% |

**13.** Dr. Pratt selected pricing multiples below the range of the guideline companies in three instances. One instance was for the latest 12-month multiples because Dr. Pratt believed that the multiples for the guideline companies in the middle of the range reflected a rebound from poor performance earlier in 1992. Therefore, Dr. Pratt testified that he believed that the multiples in the middle of the range for the guideline companies were too high. (Tr. at 199–200.) In general, Dr. Pratt chose below range pricing multiples because of the perceived enterprise and shareholder risk factors. (Tr. at 200–201.)

**14.** Plaintiff's expert, Dr. Pratt, selected the following market pricing multiples:

| Pricing Multiple | Selected Multiple (previous 12 months) | Comparison to Guideline Cos. | | Selected Multiple (5-yr. average) | Comparison to Guideline Cos. | |
|---|---|---|---|---|---|---|
| MVI/EBIT | 7.5 | 9.5 | (low) | 9.75 | 9.1 | (low) |
| MVIC/EBDIT | 5.6 | 7.0 | (low) | 7.1 | 6.5 | (low) |
| MVIC/Net Sales | 0.86 | 0.95 | (median) | 1.05 | 1.05 | (median) |
| MVIC/TBVIC (Tangible Book Value of Invested Capital) | 2.48 (latest quarter) | 2.84 | (mean) | 2.48 | 2.84 | (mean) |
| Price/ Earnings | 13.5 | 14.0 | (low) | 14.3 | 10.9 | (low) |

**350**

The Court is not persuaded that Dr. Pratt's assessment of the risks to SSE as of December 1992 should result in the selection of SSE multipliers at the low end of the range of the guideline companies or, in some instances, below the range. First, defendant's expert, Dr. Spiro, recognized some of the same risks to the company: thin upper management, the relatively small size of the company compared to the guideline companies, and the lack of a nationally recognizable brand name. Second, although the nature of the company contains some inherent risks, these same factors possess positive attributes. For example, although SSE's reliance upon the route system to supply both homeowners and wholesalers with its products poses the risk that a change in the behavior of its clients could have dire business consequences, the barriers to entry are sufficiently high to limit direct competition in much of SSE's market, particularly rural areas, and customer loyalty is high. (Tr. at 106.) Dr. Pratt recognized that while SSE's home delivery system possessed some drawbacks, it also had some countervailing benefits. For example, he acknowledged that establishing a home delivery system would be costly and a risky business proposition for competitors, thereby minimizing the risk of competition to SSE's home delivery system, which was firmly established. (Tr. at 107).

Moreover, plaintiffs did not demonstrate that the risk of food contamination faced by SSE in 1992 was greater or any different than that faced by the guideline companies. The existence of substantial product liability and life insurance policies immunized SSE to a certain extent from these two risk factors. Furthermore, although Marvin Schwan was undoubtedly a key management figure, neither his death the following year nor his retirement was expected as of the 1992 valuation date. Accordingly, the court finds that the key management figure and food contamination risk factors are overstated, as far as the December 1992 valuation is concerned.

The risk factors must be considered in the context of the financial fundamentals of SSE, in particular, and the outlook of the frozen food industry in general. Dr. Pratt testified that ice cream sales were projected to grow faster than overall food sales.[15] (Tr. at 104.) He noted that between 1987 and 1992, SSE did not lose any major companies. (Tr. at 105.) In addition, Dr. Pratt noted that half of SSE's sales came from its home delivery system, a system which created the highest profit margin for SSE and whose customer-base was very loyal. (Tr. at 106.) Dr. Pratt agreed that SSE's liabilities in 1992 were lower than the guideline companies, as was its interest-bearing debt. SSE also had a higher gross profit margin than the guideline companies, higher asset utilization, and was more liquid than the guideline companies. (Tr. at 167–68.) Dr. Pratt, moreover, testified that the guideline companies had a "bad year" in 1992, as compared to SSE which had a "good year." (Tr. at 135.) Dr. Spiro further testified, based on corporate financial statements, that in the five year period up to and including 1992, SSE had doubled its sales and profitability, and had very low debt. (Tr. at 236–37.) Dr. Spiro also emphasized the strength of SSE lower and middle management, in addition to acknowledging the thinness of the top level management. (Tr. at 283.)

Finally, while Dr. Pratt's appraisal process included interviewing the management of SSE and conducting an inspection of its facilities in Marshall, Minnesota, and Dr. Spiro's admittedly did not, the Court is not persuaded that this methodological difference is as significant as plaintiffs suggest, at least with respect to the identification of enterprise level risks in 1992. Dr. Pratt's interview with SSE management on site in Marshall, Minnesota occurred after the death of Marvin Schwan, which poses the risk of "20/20 hindsight" with respect to the weight given to the risk factor of management succession and the company's reliance on a key figure. To the

| | | | | | |
|---|---|---|---|---|---|
| Price/ Cash Flow | 7.9 | 9.5 | (median) | 9.4 | 10.1 (median) |

**15.** Specifically, Dr. Pratt testified that for the time period after 1992, ice cream sales were anticipated to increase over 5 percent and in 1994, the largest single sector of the frozen food market for SSE was ice cream. (Tr. at 104.)

extent that the interviews revealed characteristics of the company not accessible through other sources, the Court finds that this information is more relevant to the assessment of shareholder risks rather than enterprise risks, and therefore, impacts the discount for lack of marketability to a greater extent than the value of shares on a freely traded basis under various methods.

In sum, although the risk factors identified by both experts are not insignificant, the totality of the circumstances and economic indicators considered by the Court in evaluating the credibility of the two appraisals weigh in favor of Dr. Spiro's pricing multiples, which more closely conform to the guideline company medians, for purposes of calculating the value of a minority share of SSE common stock as of the 1992 valuation date.

### Income Approach

The income approach incorporates a number of valuation methods. The fundamental premise underlying these methods is that the value of an asset is a function of the income that will be generated by that asset over its expected life. Both experts relied on the discounted cash flow method of estimating an asset's future economic earnings stream and the application of an appropriate risk-adjusted present value discount rate.[16]

### Discounted Cash Flow Analysis

The discounted cash flow method estimates the value of a company or shares of stock by forecasting the company's expected future cash flows and determining the present value of those cash flows by utilizing a risk adjusted present value discount rate.[17] The per share value is that of a voting minority interest in the subject company if it were publicly traded. Consequently, as with the value obtained through the Capital Markets Method, an additional discount for lack of marketability and for lack of voting rights, where appli-

cable, must be taken from the freely traded value. Where the asset is a going concern with a life expectancy assumed into perpetuity, a terminal value (also called a "reversion value") is calculated to reflect the income stream after the terminal date. In this case, both experts projected the income stream of SSE for five years after the valuation date, calculating an amount for the terminal value.

Under this method, Dr. Spiro calculated a discount rate of 15.93 percent to arrive at a value of $1,583 million and a price per minority share of SSE common stock, had the company been publicly traded, of $41.07. Dr. Pratt used a discount rate of 16.5 percent, taking into account a 7.4 percent risk premium with an additional 3 percent for the same risk factors used in calculating the market pricing multiples for the Capital Markets Method analysis, to arrive at a value of $1,280 million.

For the reasons discussed above with respect to the selection of market pricing multiples, the Court finds that the risks attributed by Dr. Pratt to SSE are overstated in comparison with Dr. Spiro's analysis of the enterprise risks facing SSE. Some of the risks that Dr. Pratt attributed to SSE stock, such as the company's reliance on Marvin Schwan and its risk from food contamination, were prospective rather than current risks or were common throughout the industry, rather than specific to SSE. Therefore, the Court accepts Dr. Spiro's discount rate of 15.93 percent as the more reliable rate for valuing SSE common stock under the discounted cash flow method. Applying this methodology results in the price per share of $41.07 before the application of discounts for lack of marketability and voting rights.

Applying the market approach, defendant's expert arrived at an initial value of $1,998.25 million for SSE with a $51.82 price per minority share. (Def.'s Ex. 1003, at 36.) The

---

**16.** The income capitalization method is used to estimate the fair market value of income-producing property by considering the present value of the future stream of income to be produced by that property. *Estate of Bennett v. Comm'r,* 58 T.C.M. (CCH) 1056, 1989 WL 155486, *aff'd,* 935 F.2d 1285 (4th Cir.1991). Neither expert utilized the dividend capitalization method because with one limited exception SSE had never paid dividends, nor was there any suggestion that divi-

dends would ever be paid in the future. (Tr. at 45.) Consequently, the experts agreed that the dividend capitalization method is not a useful method of valuing SSE stock.

**17.** The discount rate reflects the level of risk and expected growth associated with the subject investment.

income approach produced an overall value of $1.583 billion and a per share value of $41.07. (Def.'s Ex. 1003, at 40.) Believing that the income approach captures the financial and operational attributes unique to SSE more accurately than the market approach, Dr. Spiro weighted the income approach at 70 percent and the market approach at 30 percent. (Tr. at 255.) Dr. Spiro arrived at an unadjusted value of $44.29 per share for minority nonvoting SSE stock. (Def.'s Ex. 1003, at 48.)

Plaintiffs' expert arrived at an initial value based on the market approach of $1,385 million, but did not provide an estimate for the per share value of SSE common stock. (J.Ex. 508 at 61.) Based on the income approach, plaintiff's expert produced an overall value of $1,280 million. Although Dr. Pratt testified that "discounting cash flow [under the income approach] is the most desirable method" because it is "the theoretically most correct method" (Tr. at 77), he gave approximately equal weight to the primary value indications derived from the market approach and income approach. Dr. Pratt assigned a 50 percent weight to the income approach, a 10 percent weight to the transaction approach, and a 40 to 45 percent weight to the market approach, resulting in an overall value of approximately $1,340 million, or $34.80 per share, for SSE's common equity before considering discounts. (J.Ex. 508, at 61.) For the reasons discussed above, the Court adopts the government expert's indication of value based on the two major approaches, $44.29, as the more reliable indication of value on a freely traded basis.

Both experts then applied discounts for lack of marketability and for lack of voting rights to the freely traded value. For the reasons discussed below, the Court finds plaintiffs' expert's analysis of the discount for lack of marketability more credible, but adjusted the recommended discount for 1992 downward by five percent.

### Discounts for Lack of Marketability and Voting Rights

■ "A lack of marketability discount reflects the fact that there is no ready market

for shares in a closely-held corporation." *Estate of Branson v. Comm'r*, 78 T.C.M. (CCH) 78, 1999 WL 492477 (1999). As the Willamette Report notes, "the universe of realistically potential buyers for most closely held minority securities is an infinitesimally small fraction of the universe of potential buyers for publicly traded securities." Dr. Pratt described the discount rate as "the market's required rate of return for investing in stock of a company of this nature." (Tr. at 40.) The discount is taken from the actual or estimated price at which the minority shares could be sold if registered and freely traded on the public market.

Both experts relied on two sources of empirical data for aid in quantifying the discount for lack of marketability: (1) discounts on sales of restricted shares of publicly traded companies; and (2) discounts on private transactions prior to initial public offerings (IPO's). Based on these studies, and an examination of the perceived risks facing a potential investor in SSE stock, Dr. Pratt concluded that a 45 percent discount for lack of marketability was appropriate, and Dr. Spiro concluded that a 30 percent discount was justified.

Dr. Pratt's expert reports contain a far more detailed analysis of the empirical studies of trading prices of restricted shares and pre-initial public offering transactions than the AVG Report. The eight independent studies of restricted stock transactions reviewed in the Willamette Reports reported average discounts ranging from 25 to 45 percent. According to Dr. Pratt, the two most important factors in determining the size of the discount were the amount of dividends paid (more dividends are associated with a lower discount for lack of marketability) and the perceived holding period (the longer the holding period the greater the discount for lack of marketability). (Tr. at 71–72.) The second major line of studies, involving pre-IPO transactions, observed discounts averaging approximately 45 to 47 percent.[18] (Tr. at

---

**18.** The studies of pre-IPO transactions cited include a major study conducted by Willamette

Management Associates. (J.Ex. 508, at 81.)

74.) Unlike the AVG Report, the Willamette Report considered the pre-IPO studies more relevant for the purpose of determining the appropriate discount for lack of marketability. According to Dr. Pratt, the discounts observed in restricted stock studies reflect the existence of a public market for the stock once the temporary restrictions lapse. For a variety of reasons, including an increasing number of transactions under Rule 144(a), which relaxes some of the restrictions, thus making the restricted securities more marketable, purchasers of restricted stock "generally expect to be able to resell the stock in the public market in the foreseeable future." (J.Ex. 508, at 78.) Pre–IPO discounts, on the other hand, are based on purely private transactions before a company enters the public market, a situation more comparable to closely held companies such as SSE. (Tr. at 205.) A total discount that "is only slightly above the averages of the discounts observed in the pre-IPO transactions" is appropriate, according to Dr. Pratt, because SSE stock, unlike the stock observed in the pre-IPO studies, had no prospect of an initial public offering (Tr. at 74, 205.)

The AVG Report's discussion of lack of marketability discounts relies on a smaller number of studies of restricted stock and pre-IPO transaction prices. The restricted stock studies cited in the AVG Report revealed discounts ranging from 10 to 90 percent, with an average discount of at least 35 percent (Def.'s Ex. 1003, at 62–63.), while the pre-IPO study cited reported mean and median discounts of 45 percent. The AVG Report concluded that the discount rate observed by the major pre-IPO study cited may be overstated because it reflects factors not reflected in insider transaction prices. For example, "a company's value may increase significantly leading up to the stock offering, due to the greater growth prospects typically associated with access to public capital as well as the prevailing market demand for public offerings." (Def.'s Ex. 1603, at 63.) This argument supports a higher discount for marketability for SSE stock than that observed in the pre-IPO study for the reason

articulated by Dr. Pratt with respect to restricted stock studies. There is no public market for SSE stock, and the company does not contemplate entering the public market in the future.

Chief among the factors weighing in favor of a higher than average discount rate, in Dr. Pratt's view, are shareholder risks in the form of restrictive stock transfer provisions, and the provisions of Marvin Schwan's estate plan. The company by-laws contain a restrictive stock transfer provision in the form of a ninety day right-of-first-refusal, which Dr. Pratt viewed as a deterrent to investment and Dr. Spiro dismissed as a "red herring" because he believed it would not impede long-term investment. (Tr. at 318.)

Two restrictions triggered by Marvin Schwan's death would, according to Dr. Pratt, have a far greater impact on investment in SSE. First, the 3G Trust would severely impinge upon SSE stock liquidity because the 3G Trust held the controlling share of SSE voting stock for three generations, amounting to almost 200 years in perpetuity. Second, Marvin Schwan's estate plan required the implementation of an agreement between the company and the Foundation whereby the Foundation received 5,076 shares of voting common stock and 25,910,000 shares of non-voting common stock owned by the Marvin Schwan Revocable Trust. SSE was then required to redeem the stock from the Foundation. The redemption agreement, once triggered by Marvin Schwan's death and the implementation of his estate plan, would increase the company's indebtedness by approximately $869 million, thereby rendering the company highly leveraged and hindering its ability to grow through acquisitions. Dr. Pratt opined that the ninety day right of first refusal and the 200–year holding period imposed by the 3G Trust would make SSE stock unattractive to investors (Tr. at 49, 87).

Based on his discussions with SSE management, Dr. Pratt identified additional shareholder risks affecting the discount for lack of marketability.[19] First and foremost,

---

19. The Willamette report identifies the following additional factors affecting marketability: the ex-

istence of put rights; the universe of potential buyers; the size of the company; the size of the

with one exception, SSE had never paid dividends to shareholders and had no intention of paying dividends in the foreseeable future, thereby closing off one means of obtaining a return on an investment. Members of management communicated to Dr. Pratt that SSE would remain a closely-held company and had no intention of either pursuing a third party sale or public offering, in accordance with the express wishes of Marvin Schwan. Dr. Pratt's interviews further revealed that the shareholders did not have easy access to company information because SSE management did not readily provide an annual report to the shareholders. Based on these factors, Dr. Pratt's determined that there was no real market for SSE's stock.

Dr. Spiro also identified specific factors influencing the applicable liquidity discount, which reflects the inability to convert the fair market value of an investment to its cash equivalent value.[20] According to the AVG Report, the factors suggesting a liquidity discount at the low end of the applicable range included SSE's high profitability and strong sales and earnings growth and the company's competitive position and favorable economic outlook. Recognizing that highly competitive nature of the food industry, the AVG Report nevertheless considered SSE's unique distribution system an advantage, and believed that SSE was well-positioned as an established leading supplier of prepared foods for future growth. (Def.'s Ex. 1003, at 54.)

Balanced against these advantages, the AVG Report identified three major factors that would make investment in SSE relatively unattractive to an investor, and thus increase the applicable liquidity discount: 1] the lack of dividend payment history, 2] SSE's relative lack of management depth and dependence on Marvin Schwan, and 3] the company's right of first refusal with regard to the purchase of SSE shares. Unlike Dr.

Pratt, who found the restrictive stock transfer provision a very significant deterrent to an investor, Dr. Spiro concluded that the 90 day right of first refusal period should "only cause a minor increase in the applicable liquidity discount" because "a potential investor would consider an equity interest in SSE to be a long-term investment."[21] (Def.'s Ex. 1003, at 55.)

Dr. Spiro attached minimal if any significance to the redemption agreement on the ground that it was not in effect as of December 31, 1992. Instead of viewing the 3G Trust as a major deterrent to investment, Dr. Spiro hypothesized that shareholders of SSE stock would not tolerate the tying up of a controlling majority of voting shares for three generations. Dr. Spiro opined that later generations are often "no longer interested in the company," but are "interested in receiving the rewards;" therefore, the trustees of the 3G Trust would "have an obligation to serve their interests" that might force Schwan to either "merge with another company or go public" to create liquid assets for the 3G beneficiaries. (Tr. at 331.) Consequently, Dr. Spiro concluded that the 3G Trust was not a relevant factor affecting SSE's marketability.

■ The Court finds Dr. Pratt's analysis of the appropriate discount for lack of marketability more persuasive than that of the government's expert. First, Dr. Spiro's speculation about the pressure to go public created by the 3G Trust may not be considered under the objective standard applicable to valuation of closely held stock. The court is precluded from considering imaginary scenarios as to "who a purchaser might be, how long the purchaser would be willing to wait without any return on his investment, and what combinations the purchaser might be able to effect with [ ] children or grandchildren and what improvements in management of a highly successful company an outsider

---

subject block; offering or sale of company; the degree of information access and reliability; and the existence of restrictive transfer provisions. (J.Ex. 508, at 84–87.)

**20.** The AVG Report uses the terms "liquidity discount" and "discount for lack of marketability" interchangeably.

**21.** On cross examination, Dr. Spiro attributed the greater significance accorded the restrictive transfer provision at issue·in the *Simplot* case to its longer duration (one year versus 90 days.) (Tr. at 318.)

purchaser might suggest." *Estate of Simplot v. Comm'r* 249 F.3d 1191, 1195 (9th Cir.2001). Dr. Spiro's imaginary scenario, however plausible, may not be considered in valuing what a hypothetical willing buyer and willing seller would pay for closely held stock. Second, the factors identified in the AVG Report that weigh against a high liquidity discount relating to company performance and competitiveness were already taken into account in determining the appropriate pricing multiples under the market approach. Thus, the re-emphasis of these factors in the liquidity discount analysis may result in overstatement. Finally, the Court finds Dr. Pratt's analysis of the relevant empirical studies and shareholder risks more persuasive than the AVG report's rather truncated analysis. In particular, the Court is persuaded that the Marvin Schwan estate plan provisions would deter investment to a greater extent than Dr. Spiro suggests.

■ However, rather than accepting Dr. Pratt's estimate of 45 percent, the Court holds that a 40 percent discount for lack of marketability is warranted for the December 31, 1992 valuation date. The Court agrees that the company's dividend payment history, restrictive stock transfer provision, the 3G Trust and the redemption agreement constitute significant deterrents to investment because of the restraints they impose on short or long term returns. However, in 1992 the estate plan provisions, although in place, had neither been triggered nor anticipated in the immediate future. In other words, they were prospective concerns rather than actual concerns as of the 1992 valuation date. It is well-established that "valuation of the stock must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates." *Bader v. United States*, 172 F.Supp. 833, 840 (S.D.Ill.1959); *accord Hermes Consol., Inc. v. United States*, 14

Cl.Ct. 398, 415, n. 28 (1988), *Fehrs v. United States*, 223 Ct.Cl. 488, 620 F.2d 255, 264 n. 6 (1980), *Central Trust Co. v. United States*, 158 Ct.Cl. 504, 305 F.2d 393, 403 (1962).[22] In 1992, the major shareholder risks identified in the Willamette Report, and in Dr. Pratt's testimony, were in place, but had not yet been triggered by Marvin Schwan's death. The difference between potential versus actual deterrents to investment supports a 5 percent disparity between the appropriate discount for lack of marketability in 1992 (40 percent) and in 1994 (45 percent).

### Discount for Lack of Voting Rights

■ The Court accepts the shared view of the experts that a 5 percent discount for lack of voting rights is justified. A prospective buyer usually will pay a premium for shares with voting power or seek a discount for nonvoting shares. *Wallace v. United States*, 566 F.Supp. 904, 917 (D.Mass.1981) (voting shares appraised at a 5 percent premium over nonvoting shares). SSE's capital structure reflects a great disparity between the number of voting and nonvoting shares (7,610 voting to 38,550,000) issued by the company. Where there is a skewed distribution between the two classes of stock, the voting shares are at a premium. Based on their review of empirical studies, and other relevant literature, which observed lack of voting rights discounts ranging from 4 to 5.44 percent (in Dr. Spiro's report) and from 3 to 10 percent (in Dr. Pratt's report), both experts applied a 5 percent discount, which the Court adopts as well-founded.

### 1994 INCOME TAX

■ Plaintiffs argue that 26 U.S.C. § 7491(a)(1) places the burden of proof for plaintiff's 1994 income tax refund claim on the government rather than the taxpayer.

**22.** Plaintiff's reliance on SSE's actual financial results for 1993 and 1994 to cast doubt on defendant's appraisal must be similarly rejected. Although the Federal Circuit in *Krapf v. United States*, 977 F.2d 1454, 1459 (Fed.Cir.1992), held that post-valuation date transactions may provide a "parameter or give rise to an inference of the earlier value," and should not be absolutely barred from consideration, consideration of post-valuation financial results here would be improp-

er. As the government points out, "if such a technique were accepted, there would be little need to resort to the courts in valuation cases. The mere passage of time, together with the accumulation of post-valuation date data, would convert the valuation process form an inexact science to an exact science." *Estate of Gillet v. Commissioner*, 50 T.C.M. (CCH) 636, 645, 1985 WL 15056 (1985).

As a general rule, the burden of proof is on the taxpayer in tax refund cases. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). However, pursuant to 26 U.S.C. § 7491(a)(1), enacted in 1988, if the "taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer," the burden of proof shifts to the government. By its terms, Section 7491 applies to court proceedings arising in connection with examinations commenced after July 22, 1998. *Internal Revenue Service. Restructuring and Reform Act of 1998* (RRA1998), Pub.L. 105–206, sec. 3001(c)(2), 112 Stat. 727 (codified as amended at 26 U.S.C. § 7491). The government does not contest that plaintiffs' examination commenced after July 22, 1998, but claims that plaintiffs failed to present credible evidence of the value claimed, and therefore, the burden of proof is not shifted to the government.[23] Plaintiffs argue that the 1994 Willamette Report and testimony of Dr. Pratt constitute credible evidence that the value of SSE common stock was $19.77 as of December 31, 1994, and that the government failed to carry its burden of proof because it presented no evidence at trial of the 1994 value. Rather, the government relied solely on the value reported by the plaintiffs when they filed their 1994 income tax return, which was $12.51 per share. (J.Ex. 516.)

Setting aside the issue of whether the Act's preconditions have been met[24], the Court finds that plaintiff prevails on the issue of the value of SSE stock as of December 1994 under both the original rule and 26 U.S.C. § 7491(a)(1). The government declined to present any independent evidence

to support its assessment. Moreover, the government provided no explanation for the discrepancy between its reliance at trial on the $12.51 per share value, and the IRS's determination in 1998 that plaintiffs were entitled to an abatement based on the 1994 value of $19.77 reported on the plaintiffs' amended joint income tax return.

Although the Court may choose not to accept the second Willamette appraisal even if it is uncontradicted, *see Hearst Corp. v. United States,* 28 Fed.Cl. 202, 216 (1993), *vacated,* 36 F.3d 1116 (Fed.Cir.1994), the Court finds the methodological approaches and conclusions of the 1994 report persuasive. The report constitutes both credible evidence under 26 U.S.C § 7491(a)(1), and, together with Dr. Pratt's testimony at trial, sufficient evidence to satisfy plaintiffs' burden of proof under the pre-existing general rule of *Welch v. Helvering* and *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935) (plaintiffs bear the burden of showing the invalidity of the IRS's determination of deficiency and establishing the basis for judgment in the plaintiffs' favor by establishing the correct amount of assessment or of deduction claimed).

The 1994 Willamette Report identifies several additional risk factors inherent in an investment in SSE. These factors included (1) Company President and chairman Marvin Schwan's unexpected death on May 9, 1993; (2) a substantial increase in the company's leverage as a result of the Redemption triggered by Marvin Schwan's estate plan; (3) an October 1994 salmonella contamination, and resulting product recall and plant clo-

23. "Credible evidence" is defined by the RRA 1998's legislative history as the "quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." H.R.Conf.Rep. No. 105–599, at 240–41 (1998), 1998–3 C.B. 747, at 994–95.

24. Under the Act, four conditions must be met before the burden of proof shifts to the IRS: (1) the taxpayer must comply with the requirements of the Code and applicable regulations promulgated thereunder to substantiate any item; (2) the taxpayer must maintain records; (3) the taxpayer must comply with reasonable requests

made by the Secretary for meetings, interviews, witnesses, information, and documents, and must first exhaust all administrative remedies; (4) taxpayers other than individuals or estates must meet the net worth requirements for awarding attorneys fees. 26 U.S.C. § 7491(a)(2). In coming to a determination whether these conditions have been met, "[t]he taxpayer has the burden of proving that it meets each of these conditions, because they are necessary prerequisites to establishing that the burden of proof is on the Secretary." H.R.Conf.Rep. No. 105–599, at 240–41 (1998), 1998–3 C.B. 747, at 994–95. Although it seems likely that these preconditions have been satisfied, neither of the parties specifically address the issue.

sure, as well as a class action suit involving affected customers; and (4) serious shareholder concerns about the appropriateness of the Redemption Agreement. In other words, the potential or projected events identified by plaintiffs in 1992, as well as additional risks, had actually occurred by 1994. The redemption agreement created approximately $884 million in interest-bearing debt, which dramatically reduced the overall value of the company to approximately $500 million as reflected in Pratt's 1994 report. Although the long-term effects of the salmonella outbreak were unknown in 1994, the contamination required significant short-term upheavals, including a 30 day plant closure and an immediate ice cream recall. The Court finds that these post–1992 events account for the reduction in the overall value of SSE after the 1992 valuation date, based on the application of pricing multiples below the average for guideline companies, and justify the full discount for lack of marketability (45%) applied by plaintiffs' expert.

## CONCLUSION

For the reasons discussed above, the Court accepts the government's 1992 indication of value on a freely-traded basis based on the income and capital market valuation methods. However, the Court rejects Dr. Spiro's discount rate of 35 percent and finds that, for 1992, the appropriate combined discount rate is 45 percent, which represents a slight downward adjustment of Dr. Pratt's recommended 50 percent discount rate. Based on the application of a 45 percent discount rate (40% for lack of marketability and 5% for lack of voting rights) to Dr. Spiro's unadjusted value of $44.29 per share for SSE's nonvoting minority stock, the Court holds that the value of SSE minority nonvoting stock as of December 31, 1992 was $24.36 per share.

Several of the enterprise level and shareholder risks identified by Dr. Pratt and the Willamette Report for the 1992 valuation date had become economic and management realities by the 1994 valuation date. The government has not presented any reliable evidence to refute the value established by plaintiffs. The Court therefore adopts the plaintiffs' expert appraisal of the value of SSE minority stock for the December 31, 1994 valuation date. Specifically, the Court applies a 45% discount for lack of marketability and a 5% discount for lack of voting rights to the unadjusted value per share of $39.54. The Court finds that the value of SSE stock as of December 31, 1994 was $19.77 per share.

Accordingly,

(1) Counsel shall confer and reach agreement on the tax liability amount to be assessed against plaintiffs based on the Court's finding that the value of the SSE minority stock as of December 31, 1992 is $24.36 per share;

(2) Counsel shall confer and reach agreement on the tax refund amount to be entered based on the Court's finding that the value of the SSE minority stock as of December 31, 1994 is $19.77 per share;

(3) Counsel will present their joint calculations to the Court within 30 days so that judgment may be entered;

**IT IS SO ORDERED.**